IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2016 OCT 25 PM 2: 50

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

UNITED STATES OF AMERICA

-vs-

ERICK FRENCH

Cause No. A-16-CR-00215-SS

## O R D E R

BE IT REMEMBERED on the 20th day of October 2016, the Court held a hearing in the above-styled cause, and the parties appeared in person and through counsel. Before the Court are Defendant Erick French's Motion to Dismiss Counts for Multiplicity [#17] and the Government's Response [#21] thereto,[1] as well as French's Motion to Suppress Statements [#18] and the Government's Response [#20] thereto. Having reviewed the documents, the evidence presented at the hearing, the arguments of counsel, and the governing law, the Court now enters the following opinion and orders confirming its oral pronouncements.

### Background

In February 2015, the Federal Bureau of Investigation (FBI) joined an investigation into a drug trafficking organization in Temple, Texas conducted by the Drug Enforcement Administration (DEA), the Temple Police Department (TPD), and the Texas Department of Public Safety (DPS). The investigation focused on members of an organization known to be trafficking methamphetamine, cocaine, and marijuana in central Texas.

---

[1] Although the Court denied French's motion to dismiss counts for multiplicity at the hearing, French may reurge this motion on a more factually developed record at trial.

By intercepting phone calls in the course of the investigation, the Government identified "Kaleb" as a person involved with the organization. Detective Joe Fiedler, a detective in the TPD Special Investigations Unit (SIU), identified "Kaleb" as "Kaleb Trdy" through a Facebook search. Detective Fiedler also discovered through his Facebook search that Trdy worked with an individual known as Phillip Lapinskas, and Phillip Lapinskas was in several photographs on Facebook with TPD Patrol Officer Erick French. On the afternoon of February 26, 2016, Detective Fiedler approached French in the TPD parking lot to question him about Lapinskas. After informing French he was investigating a marijuana case and had seen several photographs of French and Lapinskas together, Detective Fiedler questioned French regarding his relationship with Trdy and Lapinskas. French reported he had only met Lapinskas on a couple of occasions and denied really knowing either individual. Detective Fiedler believed French was evasive and untruthful throughout the conversation.

On March 8, 2016, a federal drug conspiracy indictment was returned for charges related to the distribution of methamphetamine, cocaine, and marijuana. Pursuant to the indictment, on March 10, 2016, agents executed numerous search and arrest warrants in Temple, Killeen, Cameron, Austin, and Pflugerville, Texas. The "main target" or lead defendant was arrested, read his *Miranda* rights, and asked whether he would be willing to speak to the arresting officers. The lead defendant told the agents he knew they were coming, had already contacted an attorney, and the agents would find no "dope" in the house. He declined to speak further. After the lead defendant indicated he had been notified of the impending execution of search and arrest warrants against him, the agents became concerned the investigation had been compromised.

On March 16, 2016, agents interviewed conspiracy member Johnny Rangel. During the interview, Rangel explained his roommate, Kaleb Trdy, worked at O'Reilly Auto Parts with

2

Phillip Lapinskas. Rangel indicated he had been discussing the delivery of a package of marijuana to the apartment when Trdy came home from work and explained "Phil" has a friend at the TPD who advised Phil the narcotics unit was watching them and possibly tapping telephones. Rangel relayed this information to a co-conspirator.

That same day, agents interviewed Kaleb Trdy. During the interview, Trdy admitted his friend, Phillip Lapinskas, told them the TPD SIU was watching Trdy and Rangel and tapping a telephone. Trdy identified French as the source of Lapinskas's information.

Based on these interviews, FBI Special Agent Daniel Tichenor and other investigators determined their next step was to interview French. Later that day, on March 16, 2016, Special Agent Tichenor and Detective Fiedler contacted Deputy Chief Jim Tobin of the TPD and said they wanted to interview French. Because French was off duty at the time, Deputy Chief Tobin directed French's supervisor to call French back to the police department. French arrived back at the police department at approximately 6:30 p.m. Deputy Chief Tobin told French two agents wanted to speak with him in the police chief's conference room. French did not ask Deputy Chief Tobin any questions.

Special Agent Tichenor and DEA Special Agent Culver interviewed French that evening. At the beginning of the interview, Special Agent Tichenor clarified the interview pertained to a criminal investigation separate from French's employment at TPD. No TPD personnel were present during the interview. French was not placed in custody, and agreed to answer the agents' questions.

French was asked about his conversation in February with Detective Fiedler regarding Kaleb Trdy and Phillip Lapinskas. French recalled the conversation but denied being evasive or untruthful. French was asked if he disclosed the nature of this conversation to anyone,

3

specifically Phillip Lapinskas. French denied communicating this information to Phillip Lapinskas directly, but admitted relaying this information to Phillip Lapinskas's sister, Sheena Lapinskas, who is a dispatcher at the Bell County Communications Center. French explained that after he got off work that day around 5:00 p.m., he called Sheena and told her a TPD narcotics detective had questioned him about Kaleb Trdy. French reportedly told Sheena to "[t]ell Phil to stay away from Kaleb" because Kaleb was being "looked at." French denied telling Sheena that her brother, Phillip, was a target of any investigation and denied mentioning or having knowledge of any wiretaps. Special Agent Tichenor asked French if he would be willing to submit to a polygraph examination at a later date, to which French agreed. Following the interview, Deputy Chief Tobin asked French to review a memorandum entitled "Investigatory Leave with Pay." Def.'s Ex. [#24-1] (Memorandum) at 1. The memorandum advised French he would be placed on "Investigatory Leave with Pay" status pending the outcome of an investigation "being conducted by an outside agency." *Id.* While on Investigatory Leave, French would be required to turn in his badge, firearm, and other police equipment. *Id.* He was further advised, "You will make yourself available to the command staff and investigations Monday through Friday between the hours of 08:00 and 17:00." *Id.* Both Deputy Chief Tobin and French signed the memorandum.[2]

The following day, on March 17, 2016, agents interviewed Phillip and specifically asked him about his relationship with French. Phillip reported he and French lived in the same house with Sheena and other roommates until approximately four to six weeks prior. Phillip indicated he had received a text from French about a month ago, right after French had moved out of the house. According to Phillip, the text message read something like, "Figured you should know.

---

[2] The memorandum is dated "3/17/16," though French testified he signed it on March 16, 2016, following the first interview.

Temple SIU is looking at you and Kaleb, possibly for trafficking." Phillip reportedly responded, "Ok." Phillip indicated he had no further contact with French, but subsequently disclosed this information to Trdy. The agents informed Phillip that French admitted providing this information to Sheena, and not to Phillip directly. Phillip reaffirmed the information came directly from French via text message. However, further investigation into Phillip and French's phones revealed no contact between the two.

On March 17, 2016, agents interviewed Sheena. Sheena denied knowing Kaleb Trdy or Johnny Rangel. She reported she and some other roommates lived with French until recently. When asked whether French had provided her with any law enforcement sensitive information unrelated to her duties as a dispatcher, Sheena denied he ever had. Agents told Sheena French admitted to advising her to keep her brother away from Kaleb, but Sheena again denied this occurred.

On March 18, 2016, agents analyzed the toll records from French and Sheena's phones for activity occurring on February 26, 2016, after Detective Fiedler spoke with French in the TPD parking lot. The records reveal that at approximately 4:43 p.m. on February 26, 2016, French sent a text message to Sheena's phone. The two exchanged a total of nine text messages in the next five to six minutes. At 4:49 p.m., Sheena sent an outgoing text message to Phillip's phone. Thereafter, another eight text messages were exchanged between Sheena and French. At 5:16 p.m., Sheena received an incoming text message from Phillip. French then sent another two text messages to Sheena, after which Sheena sent another text message to her brother. At approximately 5:17 p.m., Sheena placed an outgoing phone call to French. The phone call lasted eight minutes. Thereafter, five more text messages were exchanged between French and Sheena.

At approximately 11:12 p.m., four more text messages were exchanged between French and Sheena.

Thereafter, on March 20, 2016, Special Agent Tichenor contacted French and arranged to meet him at the Killeen Police Department the following day to conduct a polygraph examination. On March 21, 2016, French arrived at the Killeen Police Department with Grant Goodwin, an attorney at the Combined Law Enforcement Associations of Texas (CLEAT) who was representing French. Special Agent Robert Gutierrez, the polygraph examiner, and Special Agent Tichenor greeted French and Goodwin at the Killeen Police Department. Special Agents Gutierrez and Tichenor met with Goodwin privately and explained they wanted to polygraph French regarding the disclosure of information relating to a criminal investigation. Special Agent Gutierrez explained the scope of the polygraph examination to Goodwin, and Goodwin, after meeting with French, told them French would participate in the polygraph examination.

French was given a written advisement of rights and a written consent to the polygraph interview. Special Agent Gutierrez explained the forms to French and both Special Agent Gutierrez and French signed the forms. *See* Resp. [#20-1] (Consent to Polygraph and Advice of Rights). The polygraph interview was conducted in a private suite with only Special Agent Gutierrez and French present. During the interview, French was allowed to step out on at least one occasion to discuss questions with Goodwin. During the interview, French provided a written statement. In the statement, French admitted to calling Sheena but noted, "I did not tell her there was an 'investigation' against Caleb. I did not tell her there was 'investigation' against Phillip." At no point before, during, or after the interview did Special Agent Gutierrez or Special Agent Tichenor discuss employment repercussions with French, and French did not ask about any employment implications.

On March 24, 2016, agents obtained a search warrant for Sheena's phone. After seizing her phone, Sheena admitted she had not been truthful with the agents. She was shown the toll records and asked to describe the contents of the text messages between she and French. Sheena indicated French told her TPD SIU had contacted French about "Kaleb and Phil." French reportedly asked if Kaleb "had anything on him" and indicated SIU was looking for Kaleb and Phillip. Accordingly to Sheena, French asked Sheena to run Kaleb's name through the Bell County law enforcement reporting system, ILEADS. Following these messages, French called Sheena. During the phone call, French allegedly told Sheena not to tell Phillip or anyone else where she had obtained the information. In the days following this exchange, Sheena manually deleted the text message conservation with French.

After Sheena's revelations, agents forensically examined her phone. The examination uncovered all but the first nine text messages exchanged between Sheena and French. Agents eventually recovered those messages following the seizure and examination of French's phone. Among the messages recovered, French texted Sheena, "You didn't hear this from me but phil might want to watch out they are on the radar of siu." French later texted, "[t]his is between us" and "[c]heck ileads to see if kaleb has a warrant."

### Analysis

French's sole argument in support of his motion to suppress allegedly false statements made during the course of two interviews is that Deputy Chief Tobin led him to believe he was required to answer all of the agents' questions, including those asked during the polygraph examination, or he would lose his job at the TPD. French relies on *Garrity v. New Jersey* in support of his argument that these statements were involuntary and therefore inadmissible under the Fifth Amendment. *See* 385 U.S. 493 (1967).

I.     *Garrity* **is Not Implicated.**

In *Garrity*, the United States Supreme Court held "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under the threat of removal from office." *Id.* at 499. *Garrity* involved an investigation of police officers for conspiracy to obstruct the administration of traffic laws. Before being questioned, the police officers were warned "(1) that anything [they] said might be used again [them] in any state criminal proceeding; (2) that [they] had the privilege to refuse to answer if the disclosure would tend to incriminate [them]; but (3) that if [they] refused to answer [they] would be subject to removal from office." *Id.* at 495. The Supreme Court held the statements were inadmissible, because the officers were forced to choose "between the rock and the whirlpool" of potentially incriminating themselves and losing their jobs. *Id.* at 498.

The Fifth Circuit has recognized *Garrity* may apply even where there is no explicit threat of removal from office for an individual's failure to answer questions. *See United States v. Trevino*, 215 F. App'x 319, 321 (5th Cir. 2007) (concluding a police officer's *Garrity* rights were not implicated where his supervisors were not present during the interview and never indicated to him that his job would be in any greater jeopardy if he failed to cooperate). Nevertheless, *Garrity* is not implicated every time a police officer is questioned by law enforcement. Before a police officer's testimony is considered coerced within the purview of *Garrity*, the officer must show he held an objectively reasonable belief that he would lose his job if he refused to answer questions. *Id.* at 322.

In this case, French's belief he would lose his job if he did not answer the agents' questions during the interviews was not objectively reasonable. At the hearing, French indicated he was driving home from work when he received his supervisor's call directing him to return to

8

TPD to speak with Deputy Chief Tobin. Based on this conversation, French testified he felt obligated to return to TPD. Upon arriving, French had a brief conversation with Deputy Chief Tobin, in which Deputy Chief Tobin directed him to the police chief's conference room where Special Agents Tichenor and Culver were waiting. Once in the conference room, neither agent indicated French's job was on the line. In fact, Special Agent Tichenor specifically stated the interview pertained to a criminal investigation. No TPD personnel were present during the interview. French, who maintained possession of his firearm, baton, and pepper spray throughout the interview, admitted he did not think he was in custody during the interview. Although Deputy Chief Tobin asked French to sign a memorandum which required French to turn in his badge, firearm, and other police equipment and specifically stated French must make himself available "to the command staff and investigations," Deputy Chief Tobin never indicated French's job would be in any greater jeopardy if he failed to answer the agents' questions. Moreover, French testified he knew it was standard procedure for an officer involved in a criminal investigation to be placed on administrative leave and be required to relinquish his badge, firearm, and other police equipment until the investigation was concluded. French also knew police officers generally cooperate with law enforcement during a criminal investigation. Therefore, it was no secret—simply standard procedure—for Deputy Chief Tobin to place French on paid administrative leave and take possession of his badge, firearm, and police equipment once he learned French was interviewed in a criminal investigation.

Several days after the first interview, Special Agent Tichenor called French to schedule a second interview involving a polygraph examination. It was at this time that Special Agent Tichenor first learned French had retained counsel. During the phone call, Special Agent Tichenor did not advise French the second interview was mandatory, nor did he indicate TPD

was involved. The only individuals present prior to the polygraph examination—which took place at the Killeen Police Department—were French, his attorney, Grant Goodwin, Special Agent Tichenor, and Special Agent Gutierrez.

French testified his attorney advised him the polygraph examination was voluntary and he could walk out at any time. Indeed, on at least one occasion during the interview, French stepped out of the interview to discuss questions with Goodwin. Nevertheless, French testified he believed that if he did not participate in the polygraph examination, he would suffer employment consequences for violating Deputy Chief Tobin's direct order in the memorandum, which required French to make himself "available to the command staff and investigations." French further testified he believed Goodwin was only representing him "criminally."

Looking at the objective circumstances surrounding the second interview, however, it is clear French was not faced with "the Hobson's choice of either making an incriminating statement or being fired." *See Trevino*, 215 F. App'x at 322 (quotation omitted). No one at the TPD was present during the interview. Special Agent Tichenor testified that although Deputy Chief Tobin knew the polygraph examination was going to occur after the first interview, he did not know when and where it was scheduled. In fact, Special Agent Tichenor testified he specifically scheduled the polygraph examination at Killeen Police Department—rather than TPD—to avoid embarrassing French at his department. Prior to the examination, French was given a written advisement of his rights and a written consent to the polygraph examination, which both he and Special Agent Gutierrez signed. It is undisputed French's attorney advised him the polygraph examination was voluntary.

Based on the foregoing, the Court finds there is insufficient evidence in the record to support French's argument he was coerced into answering the agents' questions. *Garrity* is therefore not implicated.

## II.     Neither *Garrity* nor the Fifth Amendment protects false statements.

Even if the two interviews at issue implicated French's *Garrity* rights, neither *Garrity* nor the Fifth Amendment provide immunity from subsequent prosecution for making allegedly false statements during a criminal investigation. *See, e.g.*, *United States v. Veal*, 153 F.3d 1233, 1240 (11th Cir. 1998), *overruled on other grounds by Fowler v. United States*, 563 U.S. 668 (2011) ("In determining whether the government may use *Garrity* statements in a subsequent federal, criminal prosecution, we note that the Supreme Court has been resolute in holding that the Fifth Amendment does not shield perjured or false statements."). In *Veal*, the Eleventh Circuit analyzed decisions from multiple circuits before concluding,

> An accused may not abuse *Garrity* by committing a crime involving false statements and thereafter rely on *Garrity* to provide a safe haven by foreclosing any subsequent use of such statements in a prosecution for perjury, false statements, or obstruction of justice. . . .

> Although an accused may not be forced to choose between incriminating himself and losing his job under *Garrity*, neither *Garrity* nor the Fifth Amendment prohibits prosecution and punishment for false statements or other crimes committed while making *Garrity*-protected statements. Giving a false statement is an independent criminal act that occurs when the individual makes the false statement; it is separate from the events to which the statement relates, the matter being investigated.

*Id.* at 1243 (emphasis omitted). "*Garrity* protection is not a license to lie or to commit perjury." *Id.* Thus, like the Eleventh Circuit in *Veal*, the Court finds French's allegedly false statements are not entitled to *Garrity* immunity. His motion to suppress these statements is therefore DENIED.

**Conclusion**

Accordingly,

IT IS ORDERED that Defendant Erick French's Motion to Dismiss Counts for Multiplicity [#17] is DENIED; and

IT IS FINALLY ORDERED that Defendant Erick French's Motion to Suppress Statements [#18] is DENIED.

SIGNED this the 25ᵗʰ day of October 2016.

SAM SPARKS
UNITED STATES DISTRICT JUDGE